Filed  11/26/14  P. v. Rodriguez CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>PEDRO LUIS RODRIGUEZ,<br><br>     Defendant and Appellant. | A134782 & A138665<br><br>(San Mateo County<br>Super. Ct. No. SC074586A)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING |

THE COURT:

Good cause lacking, defendant's petition for rehearing is denied.  The opinion filed herein on November 3, 2014 is ordered modified as follows.  First, the caption is modified to add the case number A138665, and will now read:  A134782 & A138665.

Second, the Disposition is modified to read:  "The judgment is modified to vacate the conviction on stalking (count 1), and the matter is remanded to the trial court for resentencing.  In all other respects, the judgment is affirmed.  The trial court is directed to prepare an amended abstract of judgment and to forward a copy to the Department of Corrections and Rehabilitation.  The petition for writ of habeas corpus is denied."

Dated:  _____          Signed:  _____

Filed 11/3/14 (unmodified version)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>PEDRO LUIS RODRIGUEZ,<br><br>     Defendant and Appellant. | A134782<br><br>(San Mateo County<br>Super. Ct. No. SC074586A) |

Pedro Luis Rodriguez appeals from a judgment upon a jury verdict finding him guilty of stalking (Pen. Code,[1] § 646.9, subd. (a) (count 1)); stalking while under a restraining order (§ 646.9, subd. (b) (count 2)); identity theft (§ 530.5, subd. (a) (count 4)); computer fraud (§ 502, subd. (c)(1) (count 5)); electronic data theft (§ 502, subd. (c)(2) (count 6); destroying computer data or programs (§ 502, subd. (c)(4) (count 8)); intercepting electronic communications (§ 632.5, subd. (a) (count 9)); misdemeanor domestic battery (§ 243, subd. (e)(1) (count 10)); and making threatening or annoying telephone calls (§ 653m, subd. (a) (count 11))[2]. He contends that: (1) the trial court violated his constitutional right to testify by not advising him that he possessed that right; (2) the evidence was insufficient to support the verdicts for stalking while a restraining order was in effect and for simple stalking; (3) the trial court erred in denying him counsel at the sentencing hearing; (4) the search of his cell phone violated the Fourth

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

[2] The People dismissed count 7 which alleged theft of computer services, and the jury was unable to reach a verdict on count 3 which alleged issuing a terrorist threat.

1

Amendment; and (5) the court violated section 654 in its imposition of multiple punishment for counts 4, 9, and 11.

In a separate petition for writ of habeas corpus, which we consolidate with the appeal, defendant, in propria persona, contends that he was denied the right to counsel at sentencing, that he was denied the effective assistance of counsel, and that the court committed evidentiary and sentencing issues. We vacate the conviction for simple stalking but otherwise affirm the judgment. We deny the petition.

## I. FACTS

M.C. met defendant in April 2010 and they began a dating relationship. By September 2010, she noticed that defendant was sexually aggressive and often jealous. She also became aware that he was going to jail for violating a restraining order involving a former girlfriend.

On October 2, 2010, M.C. attended a wedding reception with defendant where they both became intoxicated. After the reception, they returned to defendant's apartment. When they arrived, M.C. decided she wanted to go home. Defendant would not let her leave; he grabbed her and dragged her to his apartment. M.C. was kicking and screaming but she could not get away from defendant. Defendant told her to be quiet: "If you don't shut the 'F' word up, I am going to kill you. And I am going to — nobody will ever find your body . . . ." Defendant forced her to have sexual intercourse. The next morning, M.C. acted as if nothing had happened. She did not want to get the police involved.

During the month of October, M.C. continued her relationship with defendant. On October 29, 2010, M.C. and defendant argued, and M.C. told him to get out of her life. Defendant called her repeatedly the next couple of days. They met a week later in early November for breakfast. M.C. was attempting to give defendant "closure" and to let him know there was no reason to continue to text or talk.

Defendant continued to call M.C., sometimes up to 20 times in a row. She would answer the phone from time to time, but eventually changed her phone number on November 17, 2010. Defendant called her within hours at her new number. She

2

immediately changed her phone number again. That same day, defendant called her at the second new number.

M.C. began to feel guilty about terminating the relationship during the last two weeks of November. She reconciled with defendant at the end of November for a couple of days. She decided to end the relationship when she discovered that defendant was using a dating Web site and that he had accessed pornography on the computer. She told defendant that she never wanted to hear from him again.

Defendant immediately began a pattern of harassing M.C. by calling her cell phone and sending her text messages. He called her at 5:00 a.m. and continued to call her until late evening. He also called her using different telephone numbers that she recognized as someone she knew, such as her parents' or her brother's telephone numbers. M.C. later learned that defendant was using a spoof card.[3] Defendant also sent letters to her parents seeking their intervention. He knocked on M.C.'s apartment door or windows on a nearly daily basis, sometimes in the middle of the night, and sent her derogatory text messages.

On December 27, 2010, at about 5:40 a.m., the police responded to M.C.'s 911 call that defendant was trying to break into her apartment. M.C. was frantic and crying. She reported that defendant had been consistently showing up at her apartment and banging on her windows or her door, and that he was sending her multiple text messages and calling her.

On December 28, 2010, M.C. obtained a restraining order against defendant. The restraining order lapsed on January 19, 2011 because M.C. failed to appear for a court hearing. Defendant thereafter commenced his pattern of harassing phone calls.

M.C. met with Maureen Kildee, an attorney, to discuss the restraining order on January 26, 2011. Kildee had never met defendant. After meeting with M.C., she went to a pub in San Mateo to meet with friends. On January 29, 2011, Kildee received an e-

---

[3] A spoof card enables a caller to change what someone sees on his or her caller ID display when he or she receives a phone call.

3

mail from defendant, noting that she had been at the pub on January 26, 2011. Kildee was concerned for her own safety because the e-mail suggested that defendant had been following her. She received another e-mail from defendant the following day. He again included information in the e-mail suggesting he was following Kildee, and he referenced the fact that she had called M.C. Kildee contacted the police because she feared defendant was not only following her but also accessing M.C.'s voicemail.

On February 1, 2011, the court granted M.C.'s request for a restraining order against defendant. Defendant called M.C. that afternoon using a spoof card number. Defendant continued to contact her on an almost daily basis through February. His messages expressed anger. M.C. changed her phone number again on February 8, 2011.

On February 11 and 15, 2011, M.C. went to the police department to report that defendant had violated the restraining order. She provided documentation supporting the violations including phone records, e-mail records, and billing statements. The matter was forwarded to the detective bureau for investigation.

On February 14, 2011, M.C.'s cell phone coverage was suspended even though she had paid her bill and had not cancelled her service. When the service was reactivated that same day, it was again suspended without her authorization and her password was changed. On February 15, 2011, she learned that her debit card was cancelled and that she had been signed up for a "creditkarma.com" account at a cost of $20 per month. On another occasion, she was locked out of her e-mail, Facebook, and Verizon wireless on-line accounts because someone had changed the passwords on those accounts. When she tried to set up new passwords, they were changed within minutes to ones she did not authorize. Beginning on February 25, 2011, M.C. began to receive a barrage of text messages from the Web site, Txt2Day.com, an anonymous text messaging service. The tampering with her cell phone continued through February and March, with phone calls, text messages, and changes to her voice mail box and cell phone pin numbers. M.C. felt threatened, anxious, and terrorized as a result of the string of calls and text messages and changes to her accounts. The electronic tampering ended on March 18, 2011. The police arrested defendant on March 22, 2011.

4

Detective Alex Rizzato investigated the case beginning in February 2011. He subpoenaed the telephone records of both defendant and M.C. On March 22, 2011, he conducted surveillance of M.C.'s apartment and observed defendant drive by her residence and come to almost a complete stop in front of it at around 5:30 a.m. Defendant was in violation of the restraining order because he was within 100 yards of M.C.'s residence. Rizzato effected a traffic stop and arrested defendant. In a search incident to defendant's arrest, Rizzato found defendant's iPhone. He opened the browser on the phone and found that the last Web site defendant visited was an encryptor type Web site. He also found numerous applications on the phone including Google Voice, Text Now, and Zionks, a spoof card website. Rizzato explained that spoofing allows an individual to change his or her outgoing phone number so that it appears to be a different phone number. Defendant also had a police radio application on his phone that allowed him to listen to police scanners on his phone, and Vopium, an application allowing him to make free calls over the Internet.

Rizzato, along with other officers, searched defendant's apartment pursuant to a search warrant. He seized defendant's computers as well as a stack of business cards which included one on which he had written Rizzato's parents' home phone number on it, an unlisted number. Rizzato found his work phone number and different variations of his name on defendant's desk. Rizzato became concerned for his safety.

The police also found papers with M.C.'s phone number, e-mail addresses, and the e-mail addresses of some of her friends and of her attorney. In addition, they found a machete, a switch blade knife, and a samurai sword.

Rizzato subsequently listened to the recordings of defendant's telephone calls from the county jail. In one of defendant's calls, he instructed a family member to log onto his e-mail and Google accounts and to notify the account providers that his accounts had been hacked. In another, he instructed a friend to delete his telephone calls to M.C.'s telephone number and to delete any "spoof" calls.

5

In a search of defendant's car, the police found a laptop computer and a GPS tracking device jammer. The latter device is used to jam or scramble any type of GPS tracking signal.

The police sent defendant's computer equipment to the FBI's regional computer forensic laboratory for examination. FBI Agent Sherman Kwok testified that defendant's internet browsing history showed that he had accessed Web sites designed to hide or encrypt a person's identity when sending e-mail messages. Defendant's computers and iPhone were also the source of many of the e-mails M.C. received.

Another witness, S.S., testified that she met defendant when she was 17 and began dating him in 2008. Defendant became verbally and physically aggressive toward her, but she continued to date him until December 2009. In December 2009, S.S. reported defendant to the police because defendant had been physically violent with her to the point she had collapsed on the floor of his apartment. She ended the relationship with defendant, but he continued to call her and send her e-mails. He called her work place, sent e-mails to her boss, and hacked her cell phone and e-mail accounts. He called her contacts and badgered them, and sent e-mails using her name and account. Defendant also posed as S.S. on Skype and used a woman's voice to talk to her contacts. S.S. was a "nervous wreck" and felt that defendant was threatening her safety, her job, and her co-workers. She obtained a restraining order against defendant in March 2010.

Defendant violated the restraining order by continuing to harass S.S. with e-mails and text messages. The latter did not show defendant's telephone number but a "999" number. S.S. had to change her phone number six or seven times because defendant would obtain the new one and continue to harass her. As a result of defendant's violation of the restraining order, he pled no contest to a criminal charge. He served a county jail sentence on the charge in September 2010.

## II.  DISCUSSION

### 1.  *The court did not deny defendant the right to testify.*

Defendant elected to represent himself at trial.[4]  He contends that the trial court denied him his constitutional right to testify when it did not inform him that he had that right.

"A criminal defendant has a right, under the Sixth Amendment to the federal Constitution, to conduct his own defense, provided that he knowingly and intelligently waives his Sixth Amendment right to the assistance of counsel.  [Citations.]"  (*People v. Blair* (2005) 36 Cal.4th 686, 708.)  A " 'defendant who chooses to represent himself assumes the responsibilities inherent in the role which he has undertaken,' and 'is not entitled to special privileges not given an attorney . . . .' "  (*People v. Barnum* (2003) 29 Cal.4th 1210, 1221 (*Barnum*), quoting *People v. Redmond* (1969) 71 Cal.2d 745, 758.)  Thus, a judge is not required to assist or advise a defendant who chooses to represent himself on the law or on evidentiary or procedural issues.  (*Barnum,* at p. 1222.)

Moreover,  there is no requirement that the trial court advise a self-represented defendant of the right to testify.  (*Barnum, supra,* 29 Cal.4th at p. 1223; *People v. Jones* (1992) 2 Cal.App.4th 867, 873.)  A self-represented defendant acts "at his or her peril." (*Barnum, supra,* at p. 1221.)

Defendant suggests that the court's admonishments during his examination of witnesses to simply ask questions and not testify while doing so constituted an advisement that he could not testify in his own defense.  The court did not so advise defendant.  Rather, in attempting to instruct defendant on how to form his questions, the court told defendant, on more than one occasion, "Don't testify, Mr. Rodriguez.  Ask questions,"  and "You can't testify when you are asking questions."  If defendant failed to understand that he had an absolute right to testify in his own behalf, he cannot now claim error.  He waived his right to counsel and acknowledged that he understood the risks of

---

[4] The trial court ordered that Kevin Nowack of the Private Defender panel, who had initially been appointed as counsel for the defendant, remain in the case as stand-by counsel with the understanding that he was not part of the defense team, but would be at the trial to step in if necessary.

representing himself at trial. We note further that the court instructed the jury after defendant's closing argument that defendant had the right to testify: "There is one issue that arose in the argument that I wanted to clarify about the defendant's testifying. [¶] The defendant has the absolute right to testify or not testify. It is his choice. . . ." Defendant, at no point, requested that he be allowed to testify. To the contrary, after the People rested, the parties discussed the introduction of certain evidence that defendant wished to introduce. The prosecutor informed the court that defendant was not planning to take the stand. Defendant did not suggest otherwise. On this record, no error appears.

## 2. *The simple stalking conviction must be vacated.*

Relying on *People v. Muhammad* (2007) 157 Cal.App.4th 484 (*Muhammad*) defendant contends that he was improperly convicted of both simple stalking and stalking in violation of a restraining order (§ 646.9, subd. (b)) because the offenses are based on the same conduct and section 649.9, subdivision (b) is a penalty provision. Defendant is correct and the Attorney General concedes the error.

The *Muhammad* court explained that subdivision (b) of section 646.9 does not define a substantive offense. "Subdivision (a) sets out the elements of the crime of stalking.[] Subdivisions (b) and (c), after referring to subdivision (a) focus on [the defendant's criminal history] which justifies a higher penalty than that prescribed for stalking.' [Citations.] . . . . The effect of subdivisions (b) and (c) is to establish a higher base term for stalking when it is committed by a defendant with a particular criminal history." (*Muhammad, supra,* 157 Cal.App.4th at pp. 493–494.) The *Muhammad* court therefore determined that the defendant had committed only the single offense of stalking although his history of misconduct satisfied three separate penalty provisions of section 646.9. (*Id.* at p. 494.) The court held that the defendant could be convicted of only one count of stalking and vacated three of the defendant's stalking convictions. (*Ibid.*)

Here, count 1 of the information alleged that defendant committed the offense of stalking between October 2, 2010 and March 22, 2011 by repeatedly following or harassing M.C. and making a credible threat against her or her immediate family. Count

8

2 of the information alleged that the crime of stalking in violation of a restraining order occurred between December 29, 2010 and March 22, 2011.

The Attorney General concedes that the allegations of both counts were based on the same overlapping course of conduct and constituted but a single substantive offense. Defendant could not have committed count 2 without committing the offense in count l because the latter offense included the conduct alleged in count 2. (See *People v. Avina* (1993) 14 Cal.App.4th 1303, 1311 ["When a criminal statute punishes a course of conduct, the prosecution may not divide that course up into multiple counts of the offense; the entire continuous course constitutes only a single violation of the statute."].)

As in *Muhammad,* defendant committed the single offense of stalking while his history of misconduct against M.C. also satisfied the separate penalty provision of section 646.9, subdivision (b). Because the trial court selected count 2 as the principal term, we affirm that conviction and vacate the conviction for simple stalking. (*Muhammad, supra,* 157 Cal.App.4th at p. 494 ["[S]ince the court selected the count 4 conviction under subdivision (c)(2) of section 646.9 as the principal term, it is appropriate to affirm that conviction and vacate his convictions on [the subordinate stalking counts]"].)

### 3. *The evidence is sufficient to support the stalking while under a restraining order conviction.*

Defendant also argues that the evidence was insufficient to support his conviction of stalking while a restraining order was in effect, but in so arguing, he ignores a significant portion of the evidence, in particular the almost daily pounding on her door and window.

We review the judgment under the substantial evidence standard. (*People v. Hatch* (2000) 22 Cal.4th 260, 272.) Under this standard, we must review " 'the whole record in the light most favorable to the judgment' and decide 'whether it discloses substantial evidence . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*Ibid.,* quoting *People v. Johnson* (1980) 26 Cal.3d 557, 578.) If the circumstances reasonably justify the verdict, we cannot reverse merely because a contrary finding might also be reasonably deduced from the circumstances.

9

(*People v. Redmond, supra,* 71 Cal.2d at p. 755.)  We will reverse only if it "clearly appear[s] that upon no hypothesis whatever is there sufficient substantial evidence to support [the judgment]."  (*Ibid.*)

Here, the evidence showed that defendant was persistent in his harassment and stalking of M.C. from late December 2011 to the time of his arrest in March 2012.  He not only called and texted her repeatedly day and night, he would knock on her apartment door or windows almost daily, sometimes in the middle of the night.  M.C. was terrified of defendant; she was concerned for herself and her family as well as the children with whom she worked.   She felt that he might harm her because he had hurt her before and shown other signs of violence when he assaulted and threatened her in October.  She obtained a restraining order against him, but he continued to stalk her.  He sent her spoof text messages and called her using a spoof card Web site.  His messages became more angry.  He impliedly threatened her with text messages stating that she would have a bad day when he was having a bad day and "Time for sorrys [sic]," "Today should be the day you fix everything," and "You[r] revenge is served best cold."  He also texted, "I am so sick of people who enjoy seeing other people hurt.  You are one of those people."  He threatened to come to her work place; which made her fear for her safety.  The evidence of defendant's relentless harassment, threats, and stalking was more than sufficient to support the judgment for count 2.[5]

## 4. *Defendant was not denied the right to counsel at sentencing.*

Defendant further argues that he was denied his right to counsel at sentencing. This argument fails because defendant opted to represent himself at the sentencing hearing.

The relevant facts are as follows:  Following the verdict, defendant requested that his former counsel be reappointed for the sentencing proceeding.  The trial court granted the request.  Several weeks later, however, defendant again requested to proceed in propria persona.  The court warned defendant that the sentencing issues were complicated

---

[5] Defendant's argument that there was insufficient evidence to support count 1 is moot in light of our conclusion that the conviction of count 1 must be vacated.

and that it might be better for an attorney to represent him. Defendant assured the court that he understood the risks. The court granted the motion, noting that Nowack would be relieved of his appointment and would no longer be stand-by counsel.

The court set the sentencing hearing and defendant's motion for a new trial for March 29, 2012. The court then gave defendant an additional opportunity to have Mr. Nowack represent him at sentencing. The following colloquy occurred: "[THE COURT]: . . . Mr. Rodriguez — thinking about it, you can either have [Mr. Nowack] as your attorney or not. Lawyers just don't come in to help with one little project. [¶] [THE DEFENDANT]: I understand. [¶] [THE COURT]: That means he will be in it the whole way or out the whole way. One way or the other. [¶] [THE DEFENDANT]: He is out, sir. [¶] [MS. POVAH (deputy district attorney)]: So, Mr. Nowack will not be present on the 29th if he is no longer representing — [¶] [THE COURT]: He can show up if he wants to, but it will be as a friend of the court. But if he is not — you are not standby counsel. You have no obligation to be here, Mr. Nowack. . . ."

Defendant misrepresents the record in claiming that the court denied his request for counsel at sentencing. To the contrary, after defendant opted to proceed in propria persona at sentencing, the court again raised the issue of counsel, and gave defendant an additional opportunity to have counsel at the sentencing hearing. Defendant opted to represent himself. Consequently, the court relieved Mr. Nowack as stand-by counsel. Defendant asked that the new trial motion be calendared on the same date as the sentencing hearing. The court was inclined to allow defendant appointed counsel for both proceedings even after it granted defendant's motion for self-representation, but defendant opted to represent himself.

Relying on *Menefield v. Borg* (9th Cir. 1989) 881 F.2d 696, 700 (*Menefield*), defendant argues that his request for an appointed attorney for post-trial proceedings should have been granted because there is a " 'strong presumption that a defendant's post-trial request for the assistance of an attorney should not be refused.' " In *Menefield*, the court denied a defendant's post-trial request for the appointment of counsel to assist in preparing a new trial motion. (*Id.* at p. 696.) The Ninth Circuit reversed, holding, that

11

"at least in the absence of extraordinary circumstances, an accused who requests an attorney at the time of a motion for a new trial is entitled to have one appointed, unless the government can show that the request is made for a bad faith purpose." (*Id.* at p. 701, but see *People v. Burton* (1989) 48 Cal.3d 843, 853–854 [declining to follow the federal rule that a motion for self-representation is timely if made before the jury is impaneled and must be granted unless made for the purpose of delay].)

*Menefield* is of no help to defendant. The court did not deny his request for counsel for post-trial proceedings. Rather, the court granted the request, then granted defendant's request to represent himself at the post-trial proceedings, and finally, gave defendant one last opportunity for counsel which defendant declined. Defendant waived his right to counsel.

Defendant's argument that he was seeking counsel only for the sentencing hearing and not the new trial motion is unavailing. The court granted defendant's motion to represent himself after defendant changed his mind about appointed counsel. Mr. Nowack subsequently informed the court that defendant might want representation at sentencing. The court, after acceding to defendant's request to calendar both matters for the same day, then asked defendant again whether he might want a lawyer to represent him for post-trial proceedings. Defendant told the court "[Nowack] is out, sir." He cannot now be heard to complain that he was denied the right to counsel. Even if the court erred in requiring defendant to have appointed counsel for both the new trial motion and sentencing hearing or none at all, the error was harmless. (See *People v. Ngaue* (1991) 229 Cal.App.3d 1115, 1126–1127 [harmless error analysis applies in determining whether a trial court's denial of a request to retract a *Faretta*[6] waiver was prejudicial].) Defendant has not met his burden of showing prejudice on appeal. As we explain post, there was no error in the sentencing.

---

[6] *Faretta v. California* (1975) 422 U.S. 806.

***5. Defendant is not entitled to the suppression of evidence obtained as a result of the warrantless search of his cell phone.***

Defendant argues that the search of his cell phone incident to his arrest violated the Fourth Amendment and that data found on the phone at the time of his arrest must be suppressed. We conclude that the evidence was properly admitted.

Preliminarily, we address the Attorney General's argument that defendant waived the issue on appeal because he did not contest Rizzato's initial review of the data on the phone that was obtained incident to his arrest. We disagree with the Attorney General's characterization of the record. Defendant's reply memorandum in support of his motion to suppress makes clear that he sought to preserve the issue of the legality of the seizure of data from his cell phone incident to arrest should the rule enunciated in *People v. Diaz* (2011) 51 Cal.4th 84, 110 (*Diaz*) be invalidated.

In *Diaz*, the California Supreme Court held that the police were entitled to inspect the contents of a defendant's cell phone incident to his arrest without a warrant. (*Diaz, supra,* 51 Cal.4th at pp. 93, 101.) This was the law in California prior to the United States Supreme Court's recent ruling in *Riley v. California* (2014) 134 S.Ct. 2473, 2485, 2493. There, the Court held that the search incident to arrest exception to the warrant requirement does not apply to cell phones. "Modern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse." (*Id.* at pp. 2488–2489.) Moreover, the *Riley* court recognized that digital data does not present the same risks to officers and destruction of evidence ordinarily present in custodial arrests. (*Id.* at pp. 2484–2485.) Consequently, the Court held that officers must generally have a warrant to search the digital information contained on a defendant's cell phone seized incident to an arrest. (*Id.* at p. 2485.) In light of *Riley*, defendant contends that the evidence obtained from his cell phone must be suppressed. We disagree.

"The exclusionary rule bars the prosecution from using at trial evidence that has been obtained through violation of the *Fourth Amendment*." (*U.S. v. Shelter* (9th Cir. 2011) 665 F.3d 1150, 1156, italics added.) The purpose of the rule is to deter further

*Fourth Amendment* violations. (*Davis v. U.S.* (2011) 131 S.Ct. 2419, 2427–2428 (*Davis*). The courts have recognized exceptions to the exclusionary rule, for example, where the rule's application fails to yield deterrent value or when the deterrence benefits of suppression do not outweigh its heavy costs to the judicial system and to society at large. (*Id.* at pp. 2426–2427). Thus, "[w]hen the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for *Fourth Amendment* rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. [Citation.] But when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful [citation], or when their conduct involves only simple, 'isolated' negligence, [citation], the ' "deterrence rationale loses much of its force," ' and exclusion cannot 'pay its way.' " (*Davis, supra,* at pp. 2427–2428, italics added.)

In *Davis*, the court applied the good faith exception to the exclusionary rule to a situation identical to the one here "when the police conduct a search in objectively reasonable reliance on binding judicial precedent." (*Id.* at p. 2428.) "The police acted in strict compliance with binding precedent, and their behavior was not wrongful. Unless the exclusionary rule is to become a strict-liability regime, it can have no application in this case." (*Id.* at pp. 2428–2429.)

At the time of the search here, California law authorized the search of defendant's cell phone incident to his arrest. (*Diaz, supra,* 51 Cal.4th at p. 93.) Because Officer Rizzato acted in reliance on binding California precedent in undertaking the search, the exclusionary rule does not apply to bar admission of the evidence. (*Davis*, *supra*, 131 S.Ct. at p. 2428–2429.) Accordingly, the evidence obtained as a result of Rizzato's inspection of defendant's cell phone at the time of his arrest was not subject to exclusion.[7]

---

[7] To the extent defendant claims that the motion to suppress should have been granted because the police downloaded data from the cell phone before the search warrant issued for that material, we agree with the trial court that the doctrine of inevitable discovery applied. (*People v. Robles* (2000) 23 Cal.4th 789, 800 [under inevitable discovery doctrine, illegally seized evidence admissible if it would have been discovered by the police through lawful means].)

### 6. *Section 654 does not proscribe multiple punishment on counts 4, 9, and 11.*

Defendant contends that the court's imposition of consecutive sentences for identity theft (count 4), intercepting electronic communications (count 9), and making threatening or annoying telephone calls (count 11) violates the prohibition against multiple punishment because the offenses were based on the same acts underlying the stalking while under a restraining order offense. We conclude that the record supports the court's sentencing decision.

Section 654 proscribes multiple punishment where several crimes are committed during an indivisible course of conduct with a single criminal objective.[8] The divisibility of a course of conduct depends on the intent and objective of the defendant. "[I]f the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, the trial court may impose punishment for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct. [Citations.]" (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1135.) If the evidence discloses that the offenses are incident to one objective, the defendant may be punished for any one of them but not for more than one. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1207.)

Section 654 does not proscribe multiple punishment where the course of conduct, although directed to one objective, is divisible in time. (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935.) "This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken." (*Ibid.*)

---

Hence, the trial court did not err in allowing Agent Kwok to testify regarding data downloaded from defendant's cell phone after his arrest.

[8] Section 654, subdivision (a), provides in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one . . . ."

The question of whether a defendant entertained multiple criminal objectives is a factual one for the trial court, which has broad latitude in making its determination. (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312.) The court's express or implied findings on the issue must be upheld on appeal if they are supported by substantial evidence. (*Ibid.*) We review the evidence in the light most favorable to the People and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*People v. McGuire* (1993) 14 Cal.App.4th 687, 698.)

Defendant argues that counts 4, 9, and 11 occurred during the period from October 2, 2010 and March 22, 2011, while count 2 was alleged to have occurred between December 29, 2010 and March 22, 2011, the same period during which the restraining order was in effect. He asserts that the offenses constituted a single course of conduct that was performed with a single objective.

The trial court imposed the aggravated term of four years on the stalking while under a restraining order offense, and imposed consecutive sentences of eight months on both counts 4 and 9. On counts 10 and 11, the court imposed a sentence of 156 days in the county jail with credit for 156 days served. The evidence supports the court's implied findings that the crimes, although directed to the objective of harassing and stalking M.C., were divisible in time.

Contrary to defendant's argument, the punishment for stalking while under a restraining order did not punish the prior course of conduct in which defendant engaged before the restraining order was issued. The charged offense specifically alleged that defendant committed the offense of stalking while there was a restraining order in effect between the dates of December 29, 2010 and March 22, 2011.

Counts 4, 9, and 11, on the other hand, alleged conduct between the dates of October 2, 2010 and March 22, 2011. These latter offenses, moreover, were not continuous course of conduct offenses. Rather, the jury was instructed that the People had "presented evidence of more than one act to prove that the defendant committed [these] offense[s]. You must not find the defendant guilty unless you all agree [the] People have proved that the defendant committed at least one of these acts and you all

16

agree on which act he committed." Hence, the jury necessarily agreed on at least one of the numerous acts of identity theft, intercepting electronic communications, and threatening or annoying telephone calls to find that defendant committed these offenses. Moreover, the crimes were divisible in time — defendant had ample opportunity between the commission of the various instances of his criminal conduct "to reflect and renew his . . . intent before committing the next one . . . ." (*People v. Gaio, supra,* 81 Cal.App.4th at p. 935.)   Substantial evidence supports the court's implied findings that the offenses were divisible in time although they may have been directed to the sole objective of harassing and stalking M.C.  Accordingly, section 654 did not proscribe multiple punishments for the offenses.

## III.  THE HABEAS PETITION

Defendant first argues that the trial court violated his right to counsel at sentencing.  We determined on defendant's direct appeal that defendant waived his right to counsel at sentencing and opted to represent himself.  Defendant offers no new evidence on this point; therefore, we reject the claim.

Defendant next contends that incomplete evidence pertaining to his computer access history and memory function was presented to the jury and that Agent Kwok and Detective Rizzato presented false evidence.  He also asserts that the prosecution withheld the statement of Melissa Sandoval, a Verizon representative.

Defendant, however, did not raise these issues at trial.  Since he represented himself, it was incumbent upon him to challenge the evidence presented and to subpoena witnesses he sought to question.[9]  He cannot now allege any error that may have resulted due to his own failures at self-representation.

Defendant also contends that he was denied the effective assistance of counsel when Nowack represented him prior to trial and at the section 1538.5 hearing.  He has failed to establish a prima facie case for relief.

---

[9] Sandoval did not testify at trial.  Defendant does not explain why he did not subpoena her.

17

In order to prove a claim of inadequate representation, a defendant must show that "trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates." (*People v. Pope* (1979) 23 Cal.3d 412, 425.) Effective and competent representation requires "counsel's 'diligence and active participation in the full and effective preparation of his client's case.' [Citation.]" (*Id.* at pp. 424–425.) We will reverse a conviction on the ground of inadequate counsel only if the defendant affirmatively shows that the omissions of defense counsel cannot be explained on the basis of any knowledgeable choice of tactics. (*People v. Zapien* (1993) 4 Cal.4th 929, 980.) The defendant must also establish prejudice from counsel's acts or omissions. Ordinarily, prejudice must be affirmatively proved; the defendant must establish the reasonable probability that had counsel not been incompetent, the proceeding would have had a different result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.)

Here, defendant claims that Nowack did not contest probable cause or challenge the illegal search and seizure at the section 1538.5 hearing. He also argues that Nowack interfered with his court-appointed expert, redacted certain documents, and did not pursue various subpoenas for computer records.

Defendant has failed to produce any competent evidence to support his claims that Nowack's representation prior to trial[10] and at the section 1538.5 hearing was incompetent and that Nowack interfered with the investigator, redacted documents, or failed to subpoena witnesses. "In a habeas corpus petition alleging incompetent investigation or presentation of evidence by trial counsel, a petitioner . . . must generally produce [the evidence that might have been discovered and produced by competent counsel] so the credibility of the witnesses can be tested by cross-examination." (*In re Fields* (1990) 51 Cal.3d 1063, 1071.) Defendant's self-serving declaration and miscellaneous exhibits fail to satisfy this burden. " 'Conclusory allegations made without any explanation of the basis for the allegations do not warrant relief, let alone an evidentiary hearing.' " (*People v. Duvall* (1995) 9 Cal.4th 464, 474, quoting *People v.*

---

[10] The record shows that defendant waived his right to a preliminary hearing.

*Karis* (1988) 46 Cal.3d 612, 656.)  On the record before us, defendant has failed to state a prima facie case for relief.

## IV.  DISPOSITION

The judgment is affirmed.  The petition for writ of habeas corpus is denied.[11]

_____
Rivera, J.

We concur:


_____
Ruvolo, P.J.


_____
Reardon, J.

---

[11] We deny the requests of defendant and Gloria Rodriguez, defendant's mother, to publish the opinion in this case.  (See Cal. Rules of Court, rule 8.1120.)